599 A.2d 81

**WARD ELECTRONIC SERVICES, INC. et al.**

v.

**PROPERTY & CASUALTY INSURANCE GUARANTY CORPORATION.**

**No. 15, Sept. Term, 1991.**

Court of Appeals of Maryland.

Dec. 11, 1991.

**2**

John Amato, IV (Goodman, Meagher & Enoch, both on brief), Baltimore, for petitioners.

Thomas J. Lee (J. Carroll Holzer, Holzer, Maher, DeMilio & Lee, all on brief), Eldersburg, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

Maryland Code (1957, 1991 Repl.Vol.), Art. 48A, §§ 504 through 519 (the Act) establishes the Property and Casualty Insurance Guaranty Corporation (PCIGC).[1] PCIGC collects and administers a guaranty fund from which "covered claims" against insolvent insurers are paid. The issue in this case is whether a claim paid by PCIGC was covered by the Act. That issue turns upon whether the United States of America is, within the meaning of the Act, a "resident" of the State of Maryland. For the reasons hereinafter set forth we shall hold that the United States is not a Maryland "resident," as defined in the Act.

This case grows out of the insolvency of Eastern Indemnity Company of Maryland (EICOM), a Maryland chartered, corporate surety. In February 1985 EICOM was found insolvent in a proceeding initiated under § 134 by the Maryland Insurance Commissioner (the Commissioner) in the Circuit Court for Montgomery County, Maryland. Pursuant to § 142 EICOM was ordered, in July 1985, to liquidate. The Commissioner is EICOM's receiver.

---

1. Unless otherwise noted all statutory references are to Md.Code (1957, 1991 Repl.Vol.), Art. 48A, the Maryland Insurance Code.

In September 1983 Ward Electronic Services, Inc. (Ward Inc.), one of the petitioners, entered into a contract through the United States Small Business Administration for the replacement of cathodic protection at various steel water tanks at Fort George G. Meade, Maryland. Before the award of the contracts, Ward Inc. was required to furnish to the United States payment and performance bonds pursuant to 40 U.S.C. §§ 270a *et seq.* (1988) (the Miller Act). In October 1983 EICOM, as surety, issued the payment and performance bonds under which the United States was obligee and Ward Inc. was principal.

In order to obtain bonding by EICOM, an indemnity agreement was entered into between EICOM, as indemnitee, and three joint and several indemnitors, Ward Inc. and the two remaining petitioners, Joseph E. Ward (Joseph) and Carmen A. Ward (Carmen). A further condition for the bonding of Ward Inc. by EICOM was the establishment of a bank account into which all of the payments from the Government contract would be deposited. Disbursements from that account required two signatures, one by a representative of Ward Inc. and the other by a representative of EICOM.

Ward Inc. subcontracted all of the work under the contract with the United States to Pennwalt Corporation (Pennwalt), a Pennsylvania corporation whose principal place of business is outside of Maryland. It came to pass that Pennwalt asserted a claim on the subcontract against Ward Inc. and against the payment bond. That claim was settled for $26,000. A check in that amount, dated November 20, 1984, was issued to Pennwalt signed by Joseph and by an EICOM representative. That check did not clear the special account. The reason given by the drawee was that the signature of the EICOM representative was not on file with the bank. The check was never reissued to Pennwalt prior to the EICOM receivership.

After EICOM was declared insolvent, Pennwalt made claim against PCIGC. Eventually PCIGC, in December 1987, paid Pennwalt $25,900 from the guaranty fund. This

**4**

amount represented the agreed settlement between Ward Inc., EICOM, and Pennwalt, less the $100 deductible on covered claims against PCIGC.   § 508(a)(1)(ii).   In consideration of the payment Pennwalt assigned to PCIGC Pennwalt's claim against EICOM, reserving to itself the right to claim for the $100 deductible in the EICOM receivership.[2]

The action which is now before us was brought by PCIGC, as "successor" to EICOM, in the Circuit Court for Baltimore City against Ward Inc., Joseph and Carmen to recover, *inter alia,* on the express contract of indemnity running from those defendants to EICOM.   That court, after trial on the merits, entered judgment in favor of PCIGC.   That judgment was affirmed on direct appeal. *Ward Elec. Servs. v. Property & Casualty Ins. Guar. Corp.,* 85 Md.App. 421, 584 A.2d 115 (1991).   We granted the petition for certiorari of Ward Inc., Joseph and Carmen, only as to the following question:

"Did the lower court err in holding that the United States was a 'resident' of Maryland for purposes of Article 48A, Section 505(h)?"

That question was central to one of petitioners' trial court defenses—that PCIGC has no standing to assert EICOM's claim for indemnification.   PCIGC's "successor" status depends on § 508(a)(2) which provides that PCIGC shall

"[b]e deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent."

PCIGC's theory in this case is that § 508(a)(2), by operation of law, put PCIGC in the shoes of EICOM so that PCIGC

---

**2.**   Under the Act, persons who have a covered claim against an insolvent insurer need not first claim in the receivership, await payment of the receivership dividend, if any, and then claim the net loss from PCIGC.   The Act contemplates that claims are made against PCIGC. The amount paid on the claim by PCIGC is binding on the receiver, § 511(b), the payment by PCIGC is deemed an assignment of the claimant's rights to PCIGC, § 511(a), and PCIGC in turn claims against the assets in receivership of the insolvent insurer, § 511(c).

may assert EICOM's rights under the indemnity agreement. The petitioners' point, however, is that, under § 508(a)(2), PCIGC is "deemed the insurer [only] to the extent of its obligation on the covered claims." Petitioners submit that Pennwalt's claim against EICOM was not a covered claim under the Act because neither Pennwalt nor the United States is a resident of Maryland, as required by the Act.

With respect to surety bonds PCIGC will pay "that amount of each covered claim payable to each claimant which is in excess of $100 and less than $300,000," but, in no event, is PCIGC "liable for an aggregate amount in excess of $1,000,000 under any one bond." § 508(a)(1)(ii). The relevant element of the definition of "covered claims" is that the obligations must "[a]rise out of surety bonds issued by the insolvent insurer for the protection of third parties, who are residents of this State." § 505(c)(1)(i)2.[3]

"Resident" is also a defined term in the Act. Under § 505(h) it means:

---

**3.** The entire statutory definition of § 505(c)(1) for "covered claims" is as follows:

"(c)(1) 'Covered claims' means obligations, including unearned premiums, of an insolvent insurer which:

(i) 1. Arise out of the insurance policy contracts of the insolvent insurer issued to residents of this State or which are payable to residents of this State on behalf of insureds of the insolvent insurer; or

2. Arise out of surety bonds issued by the insolvent insurer for the protection of third parties, who are residents of this State;

(ii) Were unpaid by the insolvent insurer;

(iii) Are presented as a claim to the receiver in this State or the Corporation on or before the last date fixed for the filing of claims in the domiciliary delinquency proceedings;

(iv) 1. Except for surety bond claims, were incurred or existed prior to, on, or within 30 days after the determination of insolvency; or

2. For surety bond claims arising under surety bonds issued by a domestic insurer were incurred or existed prior to, on, or within 18 months after the determination of insolvency, whether or not the surety bonds are issued for no stated period or for a stated period; and

(v) Arise out of policy contracts or surety bonds of the insolvent insurer issued for the kinds of insurance to which this subtitle applies."

"(1) An individual domiciled in this State;

(2) In the case of a corporation or other entity that is not a natural person, a corporation or entity whose principal place of business is in this State."

No party to this action contends that Pennwalt satisfies the definition of "resident." It was, as we have seen, Pennwalt that claimed on the payment bond against EICOM, and it was Pennwalt that PCIGC paid out of its fund. The United States never claimed against EICOM or against PCIGC. The United States arguably becomes involved in the analysis only because of *Joe Shifflett, Inc. v. Property & Casualty Ins. Guar. Corp.,* 77 Md.App. 706, 551 A.2d 913 (1989). *Shifflett* also arose out of the EICOM insolvency and involved a claim by a subcontractor on a payment bond. The claimant subcontractor was a corporation chartered and headquartered outside of Maryland. The construction contract owner, and bond obligee, was a Maryland limited partnership formed for the purpose of "owning, developing, constructing, maintaining and operating residential housing properties in Prince George's County, Maryland." *Id.* at 711, 551 A.2d at 916. In opposing payment from the guaranty fund, PCIGC argued that the claimant must be a Maryland resident for the claim to be a "covered" one. The Court of Special Appeals disagreed, holding that the § 505(c)(1)(i)2 reference to "the protection of third parties" included the obligee. The court reasoned that "the bond was written to protect the obligee from [the general contractor's] nonpayment of claims, irrespective of whether they arise from resident or nonresident claimants." *Id.* at 711, 551 A.2d at 916.[4]

---

4. *Shifflett* involved a nongovernmental owner. The protection which the *payment* bond furnishes a nongovernmental owner is against the risk of being required to pay twice, once to the general contractor and again to subcontractors or material suppliers, who threaten or enforce mechanics' liens. The governmental owner is not subject to mechanics' liens. *Hamilton & Spiegel, Inc. v. Board of Educ.,* 233 Md. 196, 200, 195 A.2d 710, 712 (1963); *In re Fowble,* 213 F. 676, 679 (D.Md. 1914). The requirements of the Miller Act and of the Little Miller Act, Md.Code (1988), §§ 17–101 through 17–110 of the State Finance and

Petitioners' argument could not be more simple and straightforward. The United States is not a natural person and is either a corporation or other entity. Under § 505(h)(2) only corporations or entities "whose principal place of business is in this State" are "residents" under the Act. In an agreed statement of facts petitioners have presented a three-page, single-spaced listing of the location of the main offices of federal legislative, judicial and executive departments and agencies. Not unexpectedly, overwhelmingly they are located in Washington, D.C. As far as petitioners are concerned, the precise issue in this case is whether the "principal place of business" of the United States is in Maryland.

The Court of Special Appeals, with the concurrence of PCIGC, took a different tack. That court viewed the "central issue" to be "whether the United States Government ... is a resident of Maryland within the contemplation of ... § 505." 85 Md.App. at 423, 584 A.2d at 116. That court rejected petitioners' argument that attempted "to equate the United States Government to a private corporation having one principal place of business at a specific location," because "[t]he specific definition of resident contained in § 505(h) does not attempt to address the status of the federal government." *Id.* at 428, 584 A.2d at 118. The court then turned to general principles, treating the United States as *"sui generis,* a sovereign quite distinct from a private corporation." *Id.*

The Court of Special Appeals relied heavily on *United States v. Whitcomb,* 314 F.2d 415 (4th Cir.1963), where the United States claimed for damage to one of its motor

---

Procurement Article, are for the benefit of those who supply labor and materials. *See Riley v. Abrams,* 287 Md. 348, 349 n. 2, 412 A.2d 996, 997 n. 2 (1980).

Petitioners, however, do not question the applicability of *Shifflett* to this case. Accordingly, we assume, *arguendo,* that a governmental owner of nonlienable property is a protected third party on a payment bond so that, if the United States is a "resident," Pennwalt's claim could be a covered claim under the Act.

vehicles caused by the negligence of an uninsured motorist. The claim was asserted under the former Unsatisfied Claim and Judgment Fund Law (UCJF), Md.Code (1957), Art. 66–½, §§ 150 through 179. That statute defined "person" to include "governmental bodies." UCJF § 150(i). The UCJF definition of "qualified person," however, was limited to "a resident of this State" or to the owner of a motor vehicle registered in Maryland or in a jurisdiction affording reciprocity to Maryland residents under a similar statute. UCJF § 150(g). The United States does not register its automobiles with any state authorities. The Fourth Circuit held that "[t]he United States as a sovereign is a resident of territorial United States, and we think it not unreasonable to hold the United States to be a resident of every State." 314 F.2d at 417.

. In support, the Fourth Circuit cited *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 55 S.Ct. 50, 79 L.Ed. 211 (1934) (holding that interest received by a foreign corporation on a tax refund from the United States was interest on an interest-bearing obligation of a resident of the United States, within income tax statute); *Vaughan v. Northup*, 40 U.S. (15 Pet.) 1, 6, 10 L.Ed. 639, 641 (1841) ("The United States, in their sovereign capacity, have no particular place of domicile, but possess, in contemplation of law, an ubiquity throughout the Union," so that Kentucky administrator of decedent's estate was not suable in the District of Columbia by next of kin on a claim involving debt due from United States to decedent); and *Helvering v. British–Am. Tobacco Co.*, 69 F.2d 528 (2d Cir.), *aff'd*, 293 U.S. 95, 55 S.Ct. 55, 76 L.Ed. 218 (1934) (anticipating Supreme Court holding in *Stockholms Enskilda Bank* on same tax issue).

Inasmuch as the instant matter presents a problem of statutory construction, a good place to start is with the words of the statute. The term "resident" has its principal application in the Act in determining covered claims. The Act applies "to all kinds of direct insurance, except life insurance, health insurance, mortgage guaranty insurance,

and annuities." § 504(b). For insurance other than surety the claimant in a covered claim must be a resident who is either the insured in a first party coverage situation or within the third party coverage of an insured who need not be a resident. § 505(c)(1)(i)1. Obligations based on surety bonds are covered claims where the bonds were issued "for the protection of third parties, who are residents of this State." § 505(c)(1)(i)2. In its statutory definition of "resident," the General Assembly divided all claimants into two classes, individuals or natural persons on the one hand, and corporations and other entities on the other. Based on the plain language employed, the intent of the General Assembly seems to be to occupy the entire spectrum of potential claimants by the definition of "resident." The definition seems to be universal in its application. If the claimant is not an individual, it is then a corporation or "other entity," in which case it must have a principal place of business in Maryland to be covered. The language of § 505(h) excludes the United States as a "resident."

Is the "language in question ... consistent with [the] apparent purpose" of the statute? *Kaczorowski v. City of Baltimore,* 309 Md. 505, 515, 525 A.2d 628, 633 (1987). In our view, it is. Statutes creating a guaranty fund for the payment of certain claims against insolvent insurers were recommended to the states by a model bill proposed by the National Association of Insurance Commissioners (NAIC). *See* 1 *Proceedings of the NAIC* 253 (1970). That model bill recommended excluding surety obligations from the kinds of direct insurance to be embraced by a guaranty fund bill. *Id.* Maryland adopted guaranty fund legislation along the lines of the NAIC model by Chapter 703 of the Acts of 1971. The Maryland version, however, did not exclude surety obligations. Further, although the NAIC model recommended that "[t]he meaning of the term 'residen[ts]' should be determined by the law of each state," especially with respect to corporations, 1 *Proceedings of the NAIC,* at 254, the 1971 Maryland statute did not contain a definition of "resident."

The definition of "resident" came into the Act by Chapter 440 of the Acts of 1986. Chapter 161 of that same session also addressed the guaranty fund. The background for these 1986 enactments was the 1985 Maryland savings and loan crisis and the financial collapse of the private insurance company, Maryland Savings–Share Insurance Corporation (MSSIC), that insured accounts in Maryland chartered savings and loan associations. At the First Special Session of 1985, emergency bills were enacted creating the Maryland Deposit Insurance Fund Corporation (MDIF), a state agency, that assumed by statutory merger the insurance obligations of MSSIC. At the time of the 1985 special session the estimated insured losses exceeded MSSIC's assets by more than $300 million. *See Chevy Chase Sav. & Loan v. State,* 306 Md. 384, 387–97, 509 A.2d 670, 672–77 (1986).

At its 1986 session the General Assembly was faced with the EICOM insolvency. The lead editorial in *The Sun* of February 11, 1986, stated that $38 million in policy claims were outstanding against EICOM. A staff memorandum in the bill file for House Bill 323, which became Chapter 440 of the Acts of 1986, estimated EICOM losses to be between $11 and $15 million. Another file memorandum estimated the claims against the guaranty fund to be $6 million, and that, at the two percent rate of assessment permitted against surety insurers on their Maryland business, it would take twelve years to pay all of the claims from the guaranty fund. Also of no little concern to the General Assembly at the time was that this Court had held that the guaranty fund was a state agency or instrumentality, at least for the purposes of the Public Information Act. *A.S. Abell Publishing Co. v. Mezzanote,* 297 Md. 26, 464 A.2d 1068 (1983).

The General Assembly responded to these concerns in a number of ways. By Chapter 161 of the Acts of 1986 it sought to disassociate the State from the guaranty fund by creating PCIGC as it is presently constituted. The preamble to that act in part states that

"[t]he people of Maryland may be misled by the name of the [Maryland Insurance Guaranty] Association into believing that the Association is an instrumentality of the State which insures and guarantees the payment of claims of insolvent insurers when that is not the case[.]"

Chapter 161's structural changes included eliminating the Commissioner from the selection process for directors of the new PCIGC. It is clear that the purpose of Chapter 161 was to attempt to avoid a bailout of the guaranty fund, in the wake of EICOM's insolvency, on the model of the MDIF bailout of MSSIC.

Chapter 440 addressed the problems of the EICOM insolvency. Chapter 440 made all of the provisions of the PCIGC subtitle retroactive to insolvencies, including that of a surety, existing as of January 1, 1985. § 504(a)(2). A cap was placed on the amount of a covered claim at $300,000 per claim and $1 million on any one surety bond, and at $300,000 on claims involving insolvent insurers of other covered lines. § 508(a)(1)(i) and (ii).

Chapter 440 also addressed the pools, or accounts, of insurers who were subject to assessment for covered surety claims. Prior to Chapter 440, assessments were divided into six accounts: title insurance, surety, wet marine, motor vehicle, workers' compensation, and all other nonexcluded lines. Chapter 440 consolidated surety and wet marine in the account of all other insurance. 1986 Md.Laws ch. 440, § 506(d), at 1622. In this way the amount available to pay EICOM claims was increased without increasing the rate of maximum assessment. *See* § 508(a)(3) ("No member insurer may be assessed in any year on any account in an amount greater than 2 percent of that member insurer's net direct written premiums for the preceding calendar year on the kinds of insurance in the account."). This reduced the length of time required to pay covered claims caused by EICOM's insolvency.

Further, Chapter 440 added the § 505(h) definition of "resident."

Clearly, the General Assembly was not in a fiscally expansive mood when it enacted Chapters 440 and 161. The legislative purpose was to protect Maryland policyholders who would pay as part of their premiums the assessments levied by PCIGC to pay the covered claims in the EICOM insolvency. § 516. Tying tightly to Maryland the definition of "resident," as an element of a covered claim, satisfies that legislative purpose. Conversely, excluding the United States as a "resident," because Maryland is not its principal place of business, does not produce an absurd result. Just as clearly, the General Assembly was not concerned in Chapter 440 with the metaphysical omnipresence of the national sovereign, even if, in contemplation of the law for other purposes, the sovereign is uniformly distributed throughout its territory like a gas in a spherical container.

Nor does the literal application of the definition of "resident" infringe on some superseding right of the United States. As the obligee on bonds issued by EICOM, the United States is pursuing with great success its claims in the EICOM receivership. *See Gordon v. United States Dep't of Treasury*, 668 F.Supp. 483, 485 (D.Md.1987), *aff'd*, 846 F.2d 272 (4th Cir.), *cert. denied*, 488 U.S. 954, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988) ("Many of the projects for which EICOM issued performance and payment bonds were Miller Act construction projects. Thus, the United States Government is a claimant [in the receivership] in addition to a number of private contractors."). In the *Gordon* litigation the United States obtained a declaratory judgment holding that its claims had a priority under federal statute over the claims of other insureds in the EICOM receivership. In distribution in the receivership of an insolvent insurer, PCIGC takes the priority which would have been enjoyed by the claimant on the covered claim paid by PCIGC. § 511(b); *see also* Darr, *Federal Claims in Insurance Insolvencies*, 25 Tort & Ins.L.J. 601, 621 (1990). The amount paid to the United States in the EICOM receivership therefore operates to reduce the receivership dividend, if

any, paid to PCIGC. The result is that Maryland policyholders of the insurance lines in the "other insurance" account of PCIGC will pay the amount of the receivership dividend received by the United States by reimbursing their insurers for that much of the assessment levied by PCIGC to pay EICOM covered claims under the Act.

It is also noteworthy that in *Gordon* District Judge (now Chief Judge) Black observed, by way of dicta, the following:

"Whatever the result of this case, 'covered claims' of policyholders will be paid by the Property and Casualty Insurance Guaranty Corporation. It is the guaranty association, as well as policyholders of 'uncovered claims,' who will bear the loss. 'Covered claims' are, generally, those insurance policy contracts issued to residents of the state of Maryland or for the protection of third parties who reside in the state of Maryland. Md.Ann.Code art. 48A, § 505 (1986). The claims of the United States would not be a 'covered claim.'"

668 F.Supp. at 491 n. 12. In its opinion affirming the declaratory judgment, the Fourth Circuit adopted as its opinion the opinion of the district court. 846 F.2d at 274. There is no need to depart from the literal language of the Act in defining "resident" in order to protect interests, asserted for the United States by PCIGC, which the United States does not choose to assert for itself.

PCIGC also contends that § 505(h) should be construed consistently with the administrative interpretation which, PCIGC asserts, is to recognize the United States as a "resident." The factual basis for the argument is a letter of February 9, 1987, on the letterhead of EICOM "in liquidation" and identifying Edward J. Muhl as "Commissioner of Insurance & Receiver" and James A. Gordon as "Deputy Receiver." The letter is signed by Gordon as "Receiver." It is addressed to PCIGC and refers to the concerns of the Board of Directors of PCIGC that the guaranty fund would be flooded with federal claims were the United States considered to be a resident of Maryland. Gordon opined that if the board's

"approach were to be taken by each Insurance Guaranty Fund, the Federal Government would be in the unfortunate position of not being able to seek a remedy from any Guaranty Association. I do not believe that this result is contemplated by the Guaranty Fund laws, nor do I think it would be a wise policy decision to place the Federal Government with no payment alternative."

He concluded that the most "equitable" approach would be to cover surety claims on the basis of the situs of the work.

The February 9, 1987, letter cannot be an administrative interpretation of the Act. The rule of construction for which PCIGC contends rests on the delegation by the General Assembly to a state official of the responsibility to interpret and administer a statute in accordance with the legislative intent. But, PCIGC "is not and may not be deemed a department, unit, agency, or instrumentality of the State for any purpose." § 506(f). Even if Gordon is an official of the Insurance Division of the Department of Licensing and Regulation, either generally or by virtue of a role in the receivership of EICOM, that status does not make him an official of PCIGC.

*Insurance Comm'r v. PCIGC*, 313 Md. 518, 546 A.2d 458 (1988), relied upon by PCIGC, is not to the contrary. There we held that, because PCIGC is "deemed the insurer to the extent of its obligation on the covered claims," § 508(a)(2), the Commissioner may exercise authority over PCIGC to the same extent that the Commissioner may do so over any insurer. Accordingly, the Commissioner, exercising power under § 55, could order PCIGC to pay a claim which it unreasonably refused to pay. That is the exercise of an administrative power to decide a contested case.

Nor are we persuaded by the reasoning in the February 9, 1987, letter. It was written some six months before the decision in *Gordon v. United States Dep't of Treasury*, 668 F.Supp. 483, which, far from leaving the United States with "no payment alternative," assured the United States payment to the full extent of available EICOM assets before PCIGC would receive one cent in reimbursement.

Further, whether it would be more "equitable" for PCIGC to cover surety claims on the basis of the situs of the work is a policy decision for the General Assembly. Indeed, as originally enacted by Chapter 703 of the Acts of 1971, the Act's definition of "covered claim" included a situs alternative. If all other elements of the "covered claim" definition were met, a claim was covered if "(1) the claimant or insured [was] a resident of this State at the time of the insured event; or (2) the property from which the claim [arose was] permanently located in this State." Md.Code (1957, 1972 Repl.Vol.), Art. 48A, § 505(c). The situs alternative was deleted by Chapter 651 of the Acts of 1975. To restore the situs alternative would require amendment of the Act.

For all of these reasons we hold that the United States is not a "resident" as defined in § 505(h) of the Act.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A JUDGMENT REVERSING THE JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE CITY AND REMANDING THIS CASE TO THAT COURT FOR THE ENTRY OF A JUDGMENT IN FAVOR OF THE DEFENDANTS, WARD ELECTRONIC SERVIC-ES, INC., JOSEPH E. WARD, AND CARMEN A. WARD. COSTS IN THIS COURT AND IN THE COURT OF SPE-CIAL APPEALS TO BE PAID BY THE RESPONDENT, PROPERTY AND CASUALTY INSURANCE GUARANTY CORPORATION.

ELDRIDGE, Judge, dissenting:

For the reasons set forth in Judge Bloom's opinion for the Court of Special Appeals, *Ward v. Property & Casualty*, 85 Md.App. 421, 584 A.2d 115 (1991), I would affirm.